**FILED**
Lucinda B. Rauback, Clerk
**United States Bankruptcy Court**
**Augusta, Georgia**
**By jpayton at 10:51 am, Sep 24, 2013**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE

SOUTHERN DISTRICT OF GEORGIA
Dublin Division

| | |
|---|---|
| IN RE: )<br><br>WILLIAM M. FOSTER, JR., )<br><br>     Debtor )<br>_____) | Chapter 11 Case<br>Number <u>11-30021</u> |

### OPINION AND ORDER

Before the Court is an Objection to the Claim of Wilmington Plantation, LLC ("Wilmington Plantation") filed by William M. Foster, Jr. ("Debtor" or "Foster") and Debtor's motion for partial findings pursuant to Federal Rule of Civil Procedure 52(c) made applicable to bankruptcy matters by Federal Rule of Bankruptcy Procedure 7052. This is a core matter pursuant to 28 U.S.C. §157(b)(2) and the Court has jurisdiction under 28 U.S.C. §1334. For the foregoing reasons, Debtor's motion is granted and his objection is sustained.

### FINDINGS OF FACT

This dispute centers around the creation and development of Wilmington Plantation Condominium on Wilmington Island located in Chatham County, Georgia and the ownership of various portions of the property. As a way of background, Wilmington Plantation Condominium contains approximately 19.846 acres which conceptually can be

divided into two areas of land.  In the center of the 19.846 acres is a multi-story old historic hotel building containing developed condominium units previously sold to third parties by Debtor. Surrounding the center property is about 10 acres of undeveloped land.  It is this surrounding land that is at the heart of the dispute between Wilmington Plantation and Debtor.  Under the condominium declaration, Debtor purportedly placed the entire 19.846 acres into the condominium which purportedly caused Debtor to be unable to properly convey title to this property to Wilmington Plantation.

Before entering into the sales contract with Wilmington Plantation, Debtor, as Declarant, executed a Declaration of Condominium (the "Declaration") covering the entire 19.846 acre site.  Trial April 3-5, 2013, Ex. No. 5.  The Declaration was filed with the Clerk of the Superior Court of Chatham County on December 5, 2002 and recorded in Deed Book 243 V, Page 688.  Exhibit A to the Declaration contains the following description of the Property:

> All that certain tract or parcel of land containing 19.846 acres of high land and being known as a portion of lots 37, 38, and 39 of the former Walthour Tract, General Oglethorpe Hotel Site, Chatham County, 5th G.M. District, Wilmington Island State of Georgia, upon a map or plat prepared for William M. Foster, Chicago Title Insurance Company, Exchange Bank, By John S. Kern, Dated May 5, 1998 and recorded in plat record book 15P, Folio 58 of the Chatham County

2

> Records, express reference is hereby made to the above-stated plat for better determining the metes, bounds and dimensions thereof;
>
> And also, without of warranty of title, all that certain land, lying between the above-referenced property and the low water mark of the Wilmington River and Turner's Creek; subject, however, to the rights or claims of the State of Georgia within the estuarine area as defined in the 'Coastal Marshlands Protection Act of 1970.'

Trial April 3-5, 2013, Ex. No. 5 at Exhibit "A". The Declaration makes reference to, and incorporates, a certain 2002 plat drawn by Kern & Coleman Co. (the "Plat"). Trial April 3-5, 2013, Ex. No. 5, p. 1. The Plat is recorded in Condominium Plat Book 2, Page 12, Chatham County Superior Court. Trial April 3-5, 2013, Ex. No. 4. The Declaration sets forth the following relevant definitions:

> 'Submitted Property,' as 'the property lawfully submitted to the provisions of the [Georgia Condominium] Act by the recording of condominium instruments pursuant to the provisions of the Act or this Declaration, said property being more particularly described in Exhibit "A".' [Dckt. No. 485, Ex. No. 4, p. 5 at ¶1(w)];
>
> 'Additional Property,' as 'any property which may be added to this expandable condominium in accordance with the provisions of the Declaration and the Georgia Condominium Act and shall include that portion of the property described in Exhibit "A" and designated as "RESERVED FOR FUTURE DEVELOPMENT" or similarly designated . . . .' [Dckt. No. 485, Ex. No. 4, p. 2 at ¶1(b))];

3

'Unit' as a portion of the condominium intended for any type of independent ownership and use. [Id. at ¶1(x)]; and

'Common Elements' as all portions of the Condominium other than the Units, and shall include the common areas and facilities. Id. at ¶1(e). All unit owners are to own an undivided joint interest in the common elements. [Id. at ¶6(c))].

Debtor intended for the condominium development to be an expandable condominium, and in the Declaration he reserved the right to expand the condominium for the maximum initial statutory period, pursuant to O.C.G.A. §44-3-77(b)(2), of seven (7) years. Trial April 3-5, 2013, Ex. No. 5, ¶23. The Declaration further states that the legal descriptions of any additional property which may be added at Debtor's option to expand the condominium "shall be the property described in Exhibit 'A'. . . and designated as Reserved for Future Development or similarly designated." Id.

In an effort to accomplish this, the Plat, which is referenced in the Declaration, depicts nine building pads of different shapes and sizes, labeled as "PROPOSED" and "NOT YET BEGUN." Trial April 3-5, 2013, Ex. No. 4. The Plat further depicts the proposed number of units and stories and designates that there will be parking under each of the buildings labeled as "NOT YET BEGUN." Id. However, there are no metes and bounds legal description for the nine building pads on the Plat. Trial April 3-

4

5, 2013, Ex. No. 4.  The Plat also divides the property into three separate lots.   _Id._   The Plat includes the following three notations:

> [U]tility, parking and access easement over Lot 1 as required to serve Lots 1, 2, & 3;
>
> [A]ll areas not covered by buildings to be common for use of Parking Access and Utilities; and
>
> [T]his Property is subject to any and all easements, covenants, or restrictions either recorded or unrecorded.

_Id._  The Plat also states: "SPECIAL NOTE: Proposed buildings and easements pertaining to water and sewer will be shown on this plat when the information becomes available to us."   _Id._

Between May 2003 and March 2011, after the Declaration and the Plat were recorded, Debtor sold to various third parties 44 separate condominium units in the old historic hotel building located in the center of the 19.846 acres.  Dckt. No. 485, Ex. No. 6.

In August 2004, Debtor also executed a purchase and sale agreement (the "Agreement" or "PSA") with Plantation Group, LLC who assigned the Agreement to Wilmington Plantation.  Trial April 3-5, 2013, Ex. No. 6.  In the Agreement, Debtor agreed to sell, and Wilmington Plantation agreed to purchase, the following property for $13.2 million dollars:

All that certain lot, tract or parcel of real estate, lying and being in Chatham County, 700 Wilmington Island Road Savannah, Georgia, and more particularly described in [the attached exhibit], consisting of nine (9) condominium pad sites or a two hundred twenty unit (220) expansion of Wilmington Plantation, a horizontal property regime, together with all furniture, fixtures, and equipment, plants, shrubs and trees located thereon, and together with all rights, ways and easements appurtenant thereto, including, without limitation, all of [Debtor's] right, title, and interest in and to the land underlying and air space overlying any public or private ways or streets crossing or abutting said real estate.

All of the right, title, interest, powers, privileges, benefits and options of [Debtor], or otherwise accruing to the owner of the Property [as defined by the PSA], in and to (i) any impact fee credits with, or impact fee payments to, any county or municipality in which the Land [as defined by the PSA] is located arising from any construction of improvements, or dedication or contribution of property, by [Debtor], or its predecessor in title or interest, related to the Land, (ii) any development rights, allocations of development density or other similar rights allocated to or attributable to the Land or the Improvements, whether the matters described in the preceding clauses (i), (ii) and (iii) arise under or pursuant to governmental requirements, administrative or formal action by governmental authorities, or agreement with governmental authorities or third parties.

All of [Debtor's] right, title, interest, powers, privileges, benefits and options of [Debtor] under any master deed, declaration of covenants, conditions and restrictions, architectural review board, homeowner's association (specifically including any

6

declarant rights thereunder), all of which [Wilmington Plantation] shall be deemed the successor to the [Debtor], with all rights and authorities possessed by Debtor.

All of [Debtor's] right, title and interest in and to all assignable service contracts or agreements pertaining to the use, operation or maintenance of the Land or any improvements thereon.

All of [Debtor's] right, title and interest in and to the 20 +/- acre parcel as described in survey recorded in Plat Book 2 at Page 12, Chatham County, Savannah Georgia.

All of [Debtor's] right, title and interest in the 41 +/- acre marsh area which enjoins the land.

All of [Debtor's] right, title and interest in the proposed marina to be located on Wilmington Plantation, which adjoins the Land, provided that the obligation to complete the marina improvements shall be the obligation of the Buyer.

Trial April 3-5, 2013, Ex. No. 6, PSA Ex. C, at ¶1(a) – (g).

Under the terms of the Agreement, Debtor agreed to convey to Wilmington Plantation "good and marketable fee simple title" to the property. Id. at ¶7(a). The Agreement defines "good and marketable fee simple title" as fee simple ownership that is: (i) free of all claims, liens and encumbrances of any kind or nature whatsoever other than the "Permitted Exceptions"; and (ii) insurable by a title insurance company reasonably acceptable to Plantation Group. Id. at ¶7(a). "Permitted Exceptions" include (A) current

7

city, state, and county ad valorem taxes not yet due and payable;

(B) easements for the installation or maintenance of public

utilities serving only the Property; and (C) any other matters

specified in exhibit "F", attached hereto. Id. at ¶7(a). Exhibit

F states:

> (1) Ad Valorem taxes for the year 2004 and all subsequent liens not yet due and payable; (2) Any liens, encumbrances, restrictions or easements recorded in the public records of Chatham County, Georgia, provided that any liens or encumbrances to secure monetary amounts owed by Debtor shall be satisfied at Closing.

Trial April 3-5, 2013, Ex. No. 6, PSA Ex. C, at Ex. F (emphasis

added).   The Agreement states:

> [Wilmington Plantation] shall have until the Due Diligence Date in which to examine title to the Property and in which to give [Debtor] written notice of objections which render [Debtor's] title less than good and marketable fee simple title.  Thereafter, [Wilmington Plantation] shall have until the Closing Date in which to reexamine title to the Property and in which to give [Debtor] written notice of any additional objections disclosed by such reexamination.  [Debtor] shall have until ten (10) days prior to the Closing Date  in which to satisfy all objections specified in [Wilmington Plantation's] initial notice of title objections, or agree to satisfy and any such objections that can only be satisfied at Closing, and until the Closing Date in which to satisfy all objections specified in any subsequent notice by [Wilmington Plantation] of title objections.  If [Debtor] fails so to satisfy any such objections, then, at the

AO 72A
(Rev. 8/82)

> option of [Wilmington Plantation], [Wilmington
> Plantation] may: (i) terminate this Agreement,
> in which the Earnest Money shall be refunded
> shall be refunded to [Wilmington Plantation]. .
> .; (ii) if any such objection is based upon a
> deed to secure debt, deed of trust, mortgage,
> judgment, lien or other liquidated monetary
> claim, satisfy the objection, after deducting
> from the Purchase Price the cost of satisfying
> objection; or (iii) **waive such satisfaction
> and performance and consummate the purchase and
> sale of the Property**, or (iv) if any objection
> is of the typed described in clause (ii) above,
> or is an objection that arises after the
> Effective Date, exercise the rights and
> remedies as may be provided for in paragraph
> [17][1] in event of a breach or default by Debtor.

Trial April 3-5, 2013, Ex. No. 6, Ex. C, ¶7(b) (emphasis added).

Also, the Agreement requires Wilmington Plantation to hire a

surveyor to prepare a plat:

> Survey. On or before the date fifteen (15)
> days after the Effective Date, [Wilmington
> Plantation] shall: (i) cause a surveyor
> licensed in the State of Georgia and reasonably
> acceptable to [Debtor], to prepare a current
> survey of the Land (herein called the
> "Survey"); (ii) cause two (2) plats of each
> survey to be delivered to [Debtor]. The Survey
> shall depict the number of acres of land
> contained in the Land, calculated to the
> nearest one-one hundredth (1/100) of an acre,
> and the number of acres of land contained in
> the land that is located within an area of the
> type described in paragraph 11(m) and (n)
> hereof, within any easement, or within the
> right of way of any public or private street or

---

[1]   The PSA cites the incorrect paragraph number for the
remedies provision.

9

> road.   Any improvements to the Land, all
> setbacks, encroachments or any other matters
> affecting title to the Land.

Id. at ¶8.  Notwithstanding the foregoing, the PSA also states that

"[Debtor] acknowledges and agrees that no examination or

investigation of the Property or of the operation of the Property by

or on behalf of [Wilmington Plantation] prior to Closing shall in

any way modify, affect or diminish [Debtor's] obligations under the

representations, warranties, covenants and agreements set forth in

this Agreement."   Id. at ¶14.  The Agreement further provides that

all of its provisions survive the consummation of the purchase and

sale of the Property, the delivery of the deed, and the payment of

the purchase price.   Trial April 3-5, 2013, Ex. No. 6, PSA Ex. C

at ¶22.

Prior to closing, in February 2005, a quiet title action

was filed in Superior Court of Chatham County, Georgia styled

Jeffrey Sheffer, et al. v. William Foster, Civil Action No.

CV05-0251 (the "Sheffer Quiet Title Action").   Trial April 3-5,

2013, Ex. No. 10.  The complaint sought a determination that the

condominium unit owners owned an undivided joint interest in the

19.846 acre "common area" due to Debtor's alleged submission of the

entire tract to the condominium and failing to reserve any property

for future development.   In conjunction with the Sheffer Quiet Title

10

Action, a lis pendens was placed upon the lien docket in the Superior Court of Chatham County, Georgia. Trial April 3-5, 2013, Ex. No. 9. Prior to closing, Wilmington Plantation became aware of the Sheffer Quiet Title Action and the lis pendens. Trial April 3-5, 2013, Ex. Nos. 12 and 13. Ultimately, a Settlement Agreement was reached in June of 2005 resulting in the cancellation of the lis pendens prior to closing. Trial April 3-5, 2013, Ex. Nos. 14 and 15.

Wilmington Plantation was well aware of this suit and as a condition of closing, Wilmington Plantation insisted that: (i) the lis pendens be cancelled, and (ii) Wilmington Plantation must be able to obtain title insurance insuring its interest in the Property being acquired from Debtor. Dckt. No. 485, Ex. No. 12 at ¶5. Prior to the Closing Date, an attorney ("Real Estate Attorney") certified title to the property being conveyed to Wilmington Plantation and title insurance was issued to Wilmington Plantation and its lender. Trial April 3-5, 2013, Ex. Nos. 18, 25, 26, and 27.[2] In August 2005, Debtor executed and delivered a warranty deed to Wilmington Plantation, which was recorded in Deed Book 292 C, Page 630 Chatham

---

[2]   Wilmington Plantation has brought an action against its title insurance policy, but according to Wilmington Plantation there has been no recovery and any recovery would be credited against any such recovery of its unsecured claim in this case. Dckt. No. 485, Ex. No. 37.

11

County Superior Court (the "Warranty Deed"). Trial April 3-5, 2013, Ex. No. 23. The Warranty Deed, by its terms, conveyed to Wilmington Plantation the following property:

> ALL that certain tract or parcel of land lying, being and situate in the 5th G.M. District, Chatham County, Georgia, being Lots 1, 2 and 3, Sapelo Garden Subdivision, Wilmington Plantation, [metes and bounds description of the entire tract] . . . Said property containing 19.846 acres. . . .

Id. The Warranty Deed also states that "specifically included and contained within this legal description are nine (9) condominium pad sites, which allow for a two hundred twenty (220) unit expansion." Id. The Warranty Deed states it is "given subject to all easements and restrictions of record, if any." Id. It further states that Debtor "makes no assignment of any condominium units in the old hotel, previously sold or unsold" and Debtor "is retaining ownership of all individual condominium units and the penthouse not previously sold." Id. The Warranty Deed also states Debtor "will warrant and forever defend the right and title" to the property against the claims of all persons. Id. Also at closing, Debtor assigned all of his rights in the Sheffer Quiet Title Action to Wilmington Plantation and Debtor also assigned all of his rights as the developer and declarant of the condominium to Wilmington Plantation. Trial April 3-5, 2013, Ex. Nos. 21 and 22.

12

After closing, Wilmington Plantation received notice that the plaintiffs in the Sheffer Quiet Title Action filed a Motion to Enforce Settlement Agreement (the "Motion to Enforce"). Trial April 3-5, 2013, Ex. No. 28. The Motion to Enforce alleges Debtor had breached certain provisions in the Settlement Agreement dealing with various repair and construction related issues with the old hotel building and grounds. In November 2005, Wilmington Plantation moved to intervene in the Sheffer Quiet Title Action. Trial April 3-5, 2013, Ex. No. 30. A second quiet title lawsuit also was filed by another condominium unit owner in the Chatham County Superior Court styled Radinick v. Wilmington Plantation, LLC, Civil Action No. CV05-1725 (the "Radinick Litigation"). Trial April 3-5, 2013, Ex. No. 31. Another lawsuit was filed by Wilmington Plantation Owner's Association, Inc. (the owners' association of the condominium owners of the old hotel building) in the Superior Court of Chatham County, Georgia on November 18, 2005 styled Wilmington Plantation Owner's Association, Inc. v. Michael H. Cannon, et al., Civil Action No. CV05-1739. Trial April 3-5, 2013, Ex. No. 32. A fourth lawsuit was filed in the Superior Court of Chatham County, Georgia on November 28, 2005 styled Wilmington Plantation Owner's Association, Inc. v. Wilmington Plantation, LLC, et al., Civil Action No. CV05-1780. Trial April 3-5, 2013, Ex. No. 29. These four lawsuits were

13

ultimately consolidated by the Superior Court on January 9, 2006 (the "Consolidated Lawsuits"). Trial April 3-5, 2013, Ex. No. 37.

On January 9, 2006, the Superior Court entered an order directing the parties to serve all interested parties six separate documents: (1) the Sheffer Quiet Title Action complaint; (2) the Settlement Agreement; (3) the Radinick Quiet Title Action Complaint; (4) the Answer and Counterclaim of Wilmington Plantation in the Radinick Quiet Title Action; (5) the order consolidating the Consolidated Lawsuits; and (6) a proposed reformation of the Declaration which contains the metes and bounds description of the nine building pads (the "Notice Order"). Trial April 3-5, 2013, Ex. No. 38. Thereafter, the Superior Court conducted a three day settlement conference in an attempt to resolve the Consolidated Lawsuits (the "Mediation"). Trial April 3-5, 2013, Ex. No. 41. The Mediation resulted in an announcement of settlement being made in open court on July 19, 2006. Trial April 3-5, 2013, Ex. No. 39. The court stated the purpose of the settlement conference was to resolve all outstanding issues involving building repairs, as well as questions of the "cloud on the title involving the development of the associated sites on that property." Id. In the announcement at the settlement conference, counsel for Mr. Radinick, Mr. Schneider stated as follows:

14

> We have also worked up a proposed first
> amendment to the declaration that reflects the
> removal of these nine pads from the area in the
> declaration so as to effectuate their being a
> reformation of the original declaration. . .
> there's an agreement that the . . . [Wilmington
> Plantation] is obligated under any
> circumstances to submit any of this property
> that's defined in two of the terms of the
> declaration of covenants, but they have seven
> years from [July 19, 2006] to do that, to bring
> that property in and to submit it to the
> declaration for the terms of the covenant and
> declaration.  It's my understanding also, and
> this applies to all of the pending actions,
> that the parties have relinquished their rights
> to pursue the recovery of attorney's fees
> against the other, and we anticipate that the
> parties will execute a global or mutual release
> of any and all liability other than as agreed
> hereto today.

Id. at 31:16-25 and 32:1-10.  The court stated on the record that

the hearing was "noticed to all interested parties, to include any

individual unit owners who were unrepresented by counsel and would

not have otherwise received notice."  Id. at 38:21-24.  Wilmington

Plantation's counsel, who served the documents also informed the

court that "all the mortgage companies have been notified, also."

Id. at 39:3-5.  The court further instructed that, "[W]e have

established a dispute resolution process that is designed to be on

an accelerated basis, and the reason that I pretty much insisted on

that. . . was because I know that the whole project has been in

limbo for a long time, and I sense the frustration of the residents

15

and Mr. Foster. . . and the new developer [Wilmington Plantation], that it wasn't moving forward, it was time to get it resolved. . . we cannot brook any further protracted delay with hearings and appeals. . . that is why I insisted on this accelerated dispute resolution process. . . I will be glad to consider [major issues], and I encourage everybody to think carefully before you do invoke the dispute resolution process we set out." Id. at 41-42:15-24 and 1-23 (emphasis added). The terms agreed upon in the Settlement Conference were compiled from the transcript of the Mediation into the 2006 Consent Order by counsel for Wilmington Plantation, and the order was entered by the Superior Court in September 2006 (the "2006 Consent Order") with the amended declaration and plat attached as an exhibit. Trial April 3-5, 2013, Ex. No. 41.

The 2006 Consent Order with the attachments was recorded at Deed Book 314 T, Page 440 in the Chatham County Superior Court on October 12, 2006. Id. As to title issues the 2006 Consent Order states:

> A) The Declaration of Condominium of Wilmington Plantation dated July 13, 2000, and recorded on December 5, 2002, in Book 243V, Page 688, et seq., Chatham County, Georgia records ("The Original Declaration") is reformed effective July 19, 2006, a true and correct copy which is marked "Petitioner's Exhibit 1" and made a part hereof.
>
> B) The security deed held by Wilmington

16

Plantation, LLC's lender (recorded in Deed Book 292C, Page 634, Chatham County Real Property Records) is intended to encumber only the property described in the First Amendment to the Declaration; that being nine building pads.

C) Wilmington Plantation, LLC, acknowledges that it holds title to the nine building pads as described in the First Amendment.

D) UCC Financing Statements impose no lien on anything other than the property or equipment of Wilmington Plantation, LLC.

Id. at ¶11 (emphasis added). The amended declaration remains unsigned by Wilmington Plantation, the Declarant. The 2006 Consent Order states it is a "global settlement." Id. at ¶12. The global settlement further states that:

[I]t is the intent of all parties that this Order constitutes a global settlement of all issues pending in each of the referenced cases. The parties agree to withdraw all motions and each of the cases referenced herein shall be dismissed. Additionally, Mr. Radnick shall release the Lis Pendens he filed against the subject property within ten (10) days of the date of this Order.

Each of the parties waive, relinquish and release their rights to pursue the recovery of attorneys' fees against the other.

The parties specifically except and exclude from the releases any claims or potential claims between Mr. Foster and Wilmington Plantation, LLC relating to expenditures pertaining to the homeowners association or the development of the property that are not part of the quiet title action which is before the Court.

17

Id. (emphasis added).

The 2006 Consent Order has a Dispute Resolution Process which requires:

> All matters arising out of any of the related law suits shall be resolved exclusively under this dispute resolution process. Any party shall have a period of five (5) days after receipt of a written notice to file an objection of the proposed items, whether it be an estimate, the scope of work or any other item or matter arising under this Consent Order. The Court, may but is not required, to employ an architect to assist the Court in analyzing the objection. The Court shall summarily rule on the objection, provided that if any matter involves in excess of $25,000.00, the parties shall have the right to a summary hearing on the issues before the Court, including the right to submit affidavits and submit limited live testimony with regard to said issue. The determination of the Court shall be final and not appealable as to that issue. The cost of any independent expert or consultant designated by the Court to assist the Court will be paid by Mr. Foster, except to the extent that those costs for attorney's fees and the costs for the experts (which is anticipated to be a retired architect) could be transferred and without merit, in which case the party offended by that could request and seek an award of attorney's fees and expert fees in connection with that matter.

Id. at ¶3. Counsel for Wilmington Plantation at the Mediation stated that it was "a global settlement of all issues and all, you know, anything that may be pending, and that all motions will be withdrawn and we'll clean up all that --all of that also." Trial

18

April 3-5, 2013, Ex. 39, p. 22 (emphasis added). Counsel for Wilmington Plantation confirmed that he was the scrivener of the 2006 Consent Order and he basically transcribed the language of the 2006 Consent Order from the Mediation Transcript and that explains the awkwardness of the 2006 Consent Order. Dckt. No. 507, p. 74-75.

In the previous Order denying summary judgment, viewing the language in the light most favorable to Wilmington Plantation, I found the language in paragraph 12 of the 2006 Consent Order, and its intended scope to be ambiguous and required testimony as to the intent of the parties. At trial, Debtor testified he has paid over $2.4 million in satisfaction of all his obligations under the 2006 Consent Order and would not have done so if he thought title issues still remained between the parties. Tr. Trial April 3-5, 2013, Dckt. No. 583, Vol. 1, pp. 150-151. At the trial, Mr. Nash, counsel for Debtor at the time of the settlement and who announced part of the settlement in the Superior Court, testified as to the intent of the global settlement and the language of paragraph 12. Tr. Trial April 3-5, 2013, Dckt. No. 583, Vol. 2, pp. 23-24. Mr. Nash explained:

> My intent with regard to this and following four lawsuits and three days of mediation was to resolve every single matter that was pending that could have been pending or that was raised in any way regarding this development. And I believe we carved out two very limited exceptions that dealt with usage of Mr. Foster's open accounts in [and] a claim by the

19

> homeowners' association for common area
> expenses. And that was it. Everything else
> was supposed to have been totally and
> completely resolved.

Tr. Trial April 3-5, 2013, Dckt. No. 583, Vol. 2, pp. 23-24. Mr.

Nash explained that the claims reserved between Debtor and Wilmington

Plantation pertained to Wilmington Plantation utilizing Debtor's open

accounts in Savannah in the amount of approximately $102,207.80.

Tr. Trial April 3-5, 2013, Ex. 42, Debtor's list of accounts

receivable due from Wilmington Plantation. Debtor had allowed

Wilmington Plantation to use those accounts because Wilmington

Plantation was new in town and was having difficulty getting open

credit. Mr. Nash testified:

> I think I testified earlier that it was my
> intent that it reserve all -- that it, excuse
> me, settle all issues of any kind between the
> parties except, I believe I stated two issues
> on the record, very limited scope, having to do
> with matters that had not been discussed at
> all, one being that the homeowners' association
> and, I think, the LLC, the new owner
> [Wilmington Plantation], had been utilizing
> some of Mr. Foster's open accounts and credit
> cards and accounts around Savannah, and he
> [Foster] had a claim for a certain list of
> reimbursements on those items of about
> $100,000. And that the association had
> contended that Mr. Foster owed some common area
> maintenance charges, and Mr. Foster contended
> that he was owed some common area maintenance
> charges because he'd been keeping the place up.
> Other than those items, it was my intent and my
> understanding that every matter pending, not
> pending, ever thought of between these people,

was settled.

Id. at pp. 28-29.

Subsequent to entry of the 2006 Consent Order, Wilmington Plantation sought financing for its building project.  In a letter dated November 20, 2007 addressed to PrimeTrust Bank, Wilmington Plantation states in its proposal for refinancing that "Wilmington Plantation, LLC is the owner of land on Wilmington Island, Savannah, consisting of nine (9) building pads capable of holding up to 219 residential condominium units.  The property was purchased in August 2005 for $13.2 million dollars."  Tr. Trial April 3-5, 2013, Ex. No. 44.  Wilmington Plantation admits it thought it could proceed with construction on the Property after entry of the 2006 Consent Order. Wilmington Plantation states during the process of talking to real estate attorneys Wilmington Plantation became concerned about whether it had marketable title even with the 2006 Consent Order.  Dckt. No. 511, Tr. Hr'g Oct. 31, 2012, 80:12-24.

After entry of the 2006 Consent Order, because of repair disputes Debtor was having with individual condominium unit owners and the homeowners' association, Debtor filed a Motion To Set Aside the 2006 Consent Order to which Wilmington Plantation opposed.  Tr. Trial April 3-5, 2013, Ex. No. 45-47.  In the Motion To Set Aside, Debtor alleged:  the Superior Court lacked jurisdiction to order the

21

relief granted, the 2006 Consent Order is facially invalid because the Superior Court lacked jurisdiction over all the parties; and that the order is unenforceable according to its own terms. Tr. Trial April 3-5, 2013, Ex. No. 45.  Wilmington Plantation disagreed and argued that the 2006 Consent Order was not invalid on its face due to lack of jurisdiction, as the 2006 Consent Order stated that all interested parties were served and had an opportunity to object and Wilmington Plantation argued further that the parties, including itself, had relied upon the validity of the 2006 Consent Order.  The Superior Court, after considering the briefs and arguments of the parties, denied Debtor's motion to set aside and upheld the validity of the 2006 Consent Order.  Tr. Trial April 3-5, 2013, Ex. No. 47. Debtor filed a discretionary appeal of this decision; however, the Georgia Court of Appeals denied his application, and the Georgia Supreme Court denied certiorari January 12, 2009.  Tr. Trial April 3-5, 2013, Ex. No. 49 and 52.  On August 11, 2010, prior to the bankruptcy case, Wilmington Plantation filed a lawsuit against Debtor in the U.S. District Court in the Middle District of Georgia asserting breach of contract and warranty of title claims (the "Middle District Complaint").  Tr. Trial April 3-5, 2013, Ex. No. 53.

On January 19, 2011, Debtor filed for chapter 11 bankruptcy relief staying the action on the Middle District

22

Complaint.  On May 16, 2011, Wilmington Plantation filed a proof of claim in Debtor's bankruptcy case in the amount of $21,138,884.00. Proof of Claim No. 15.  Debtor objected to Wilmington Plantation's claim on May 3, 2012.

At the trial held April 3-5, 2013, Debtor renewed his motion for summary judgment and moved for judgment as a matter of law pursuant to Bankruptcy Rule 7052 based upon caveat emptor/waiver, res judicata, issue preclusion, judicial estoppel, laches, failure to mitigate damages.  Wilmington Plantation also renewed its motion for summary judgment based upon breach of contract and breach of warranty.

### CONCLUSIONS OF LAW

Debtor argues Wilmington Plantation's claim is barred by res judicata, caveat emptor/waiver, judicial estoppel, laches, its failure to mitigate damages, and further argues the 2006 Consent Order is valid to amend the Declaration pursuant to O.C.G.A. §44-3-115 and cured any defects in title.  Debtor further contends he has not breached the PSA or the Warranty Deed.  Conversely, Wilmington Plantation argues the 2006 Consent Order did not resolve the breach of warranty or breach of contract claims.  Wilmington Plantation further argues the 2006 Consent Order is not valid due to jurisdictional issues and even if the 2006 Consent Order is valid,

23

Wilmington Plantation does not have title to the nine building pads or title to any of the land surrounding the nine building pads and therefore, Debtor has breached the PSA and the Warranty Deed.

The Court has previously addressed these issues in its Order and Opinion Denying Cross Motions for Summary Judgment. See Dckt. No. 526. Much of the Court's previous analysis revolved around the scope of paragraph 12 of the 2006 Consent Order. Now that I heard the evidence and determined the scope of paragraph 12 many of the issues need to be revisited.

**Res Judicata**.

"Under the Full Faith and Credit Act, 28 U.S.C. §1738, a federal court must 'give preclusive effect to a state court judgment to the same extent as would courts of the state in which the judgment was entered.'" Brown v. R.J. Reynolds Tobacco Co., 611 F.3d 1324, 1331 (11th Cir. 2010). The 2006 Consent Order itself must be given the same preclusive effect as a Georgia state court would give such orders. Id.; Vasquez v. YII Shipping Co., Ltd., 692 F.3d 1192 (11th Cir. 2012); Sophocleus v. Ala., Dep't of Transp., 371 F. App'x 996, 998 n. 1 (11th Cir. 2010)("[I]n determining the res judicata effect of an earlier state court judgment, we apply the res judicata doctrine of the state whose decision is set up as a bar to further litigation."); Green v. Jefferson Cnty. Comm'n, 563 F.3d 1243, 1252

24

(11th Cir. 2009)(same).

> [I]t is generally accepted that a consent
> judgment differs from a judgment rendered on
> the merits in that it results from an
> affirmative act of the parties rather than the
> considered judgment of the court following
> litigation of the issues. A consent judgment
> is one entered into by stipulation of the
> parties with the intention of resolving a
> dispute, and generally is brought to the court
> by the parties so that it may be entered by the
> court, thereby compromising and settling an
> action. Although a consent judgment is brought
> about by agreement of the parties, it is
> accorded the weight and finality of a judgment.
> Thus, a consent decree is an enforceable
> judgment and can be accorded preclusive effect.

Kothari v. Tessfaye, 733 S.E.2d 815, 819 (Ga. Ct. App. 2012) citing

Brown & Williamson Tobacco Corp. v. Gault, 627 S.E.2d 549 (Ga. 2006).

The 2006 Consent Order must be construed under the rules

of contract construction since the prior decision is a consent order

and therefore the scope of preclusion is narrower. See Alyshah

Immigration Agency, Inc. v. The State Bar of Georgia, 2005 U.S. Dist.

LEXIS 43624, at *6-7 (N.D. Ga. 2005)(stating that traditional res

judicata principals do not apply to a consent order as the scope is

much narrower). The 2006 Consent Order must be "interpreted

according to its express terms, rather than according to the

traditional principles of res judicata." Id. citing Norfolk S. Corp.

v. Chevron, U.S.A., Inc., 371 F.3d 1285, 1291 (11th Cir. 2004). Only

claims which are properly encompassed by the language of the 2006

25

Consent Order are barred.  See Alyshah Immigration Agency, Inc., 2005 U.S. Dist. LEXIS 43624, at *6-7.  "The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'"  Taylor v. Sturgell, 553 U.S. 880, 892 (2008).

> In Georgia, the collateral estoppel doctrine precludes the re-adjudication of an issue that has previously been litigated and adjudicated on the merits in another action between the same parties or their privies.  Like res judicata, collateral estoppel requires the identity of the parties or their privies in both actions.  However, unlike res judicata, collateral estoppel does not require identity of the claim-so long as the issue was determined in the previous action and there is identity of the parties, that issue may not be re-litigated, even as part of a different claim.

Anderson v. Jones, 745 S.E.2d 787, 795 (Ga. Ct. App. 2013)(finding a consent order barred relitigation of an issue resolved by the settlement in the guise of a different claim); Levingston v. Crable, 416 S.E.2d 131, 132 (Ga. Ct. App. 1992)(stating "a decree may be partly final and partly interlocutory; final as to its determination of all issues of law and fact and interlocutory as to its mode of execution" and finding the consent decree final as between the parties as to claims regarding restrictive covenants).

Debtor argues the 2006 Consent Order precludes Wilmington Plantation's breach of contract and breach of warranty claims as it

26

was a global settlement between the parties of all title issues related to the Property as it states, "it is the intent of all parties that this Order constitutes a global settlement of all issues pending in each of the referenced cases." Debtor argues the title issue is essential to the breach of contract and breach of warranty claims and thus precludes the relitigation of that issue. Debtor contends the 2006 Consent Order only reserves claims for expenditures pertaining to the homeowners' association or the development of the property and not a general reservation of any and all claims between Debtor and Wilmington Plantation. Conversely, Wilmington Plantation contends paragraph 12 of the 2006 Consent Order reserved any and all claims between Debtor and Wilmington Plantation arising out of the development of the subdivision and only settles claims that were pending before the Superior Court.

As to title issues the 2006 Consent Order states:

A) The Declaration of Condominium of Wilmington Plantation dated July 13, 2000, and recorded on December 5, 2002, in Book 243V, Page 688, et seq., Chatham County, Georgia records ("The Original Declaration") is reformed effective July 19, 2006, a true and correct copy which is marked "Petitioner's Exhibit 1" and made a part hereof.

B) The security deed held by Wilmington Plantation, LLC's lender (recorded in Deed Book 292C, Page 634, Chatham County Real Property Records) is intended to encumber only the property described in the First Amendment to

AO 72A
(Rev. 8/82)

the Declaration; that being nine building pads.

C) Wilmington Plantation, LLC, acknowledges
that it holds title to the nine building pads
as described in the First Amendment.

D) UCC Financing Statements impose no lien on
anything other than the property or equipment
of Wilmington Plantation, LLC.

Dckt. No. 485, Ex. No. 33, Consent Order, ¶11 (emphasis added).   The

global settlement further states that:

[I]t is the intent of all parties that this
Order constitutes a global settlement of all
issues pending in each of the referenced cases.
The parties agree to withdraw all motions and
each of the cases referenced herein shall be
dismissed.    Additionally,  Mr.  Radnick  shall
release  the  Lis  Pendens  he filed against the
subject  property within ten (10) days of the
date of this Order.

Each  of  the  parties  waive,  relinquish  and
release  their  rights  to pursue the recovery of
attorneys' fees against the other.

The  parties  specifically  except  and  exclude
from  the  releases  any  claims  or  potential
claims  between  Mr.  Foster  and  Wilmington
Plantation,  LLC  relating  to  expenditures
pertaining to the homeowners association or the
development of  the property that are not part
of the quiet title action which is before the
Court.

Dckt. No. 485, Ex. No. 33, Consent Order, ¶12 (emphasis added).

In  the  order  denying  summary  judgment  on  this  issue,

construing the language in the light most favorable to Wilmington

Plantation, I found the language in paragraph 12 to be ambiguous as

28

to the intent of the parties and so a question of fact remained. At the trial, Debtor's prior attorney Mr. Nash testified as to what the language encompassed. He testified that the 2006 Consent Order was intended to settle all title issues between the parties to the Mediation. As for the exceptions to the release in paragraph 12, Mr. Nash testified that Debtor had potential claims against Wilmington Plantation for charges made on Debtor's supply accounts during development of the land. Debtor had allowed Wilmington Plantation to use his accounts because Wilmington Plantation had not established credit in the community and had difficulty getting open credit for the development project. Mr. Nash explained that the claims reserved between Debtor and Wilmington Plantation pertained to Wilmington Plantation utilizing Debtor's open accounts in Savannah in the amount of approximately $102,207.80. Tr. Trial April 3-5, 2013, Ex. 42, Debtor's list of accounts receivable due from Wilmington Plantation. These were the "expenditures" as to the development of the property referred to in the 2006 Consent Order. The other reservation pertains to the homeowners' association's claim against Debtor for homeowners' association dues and Debtor's claim against the homeowners' association for money for expenses he had incurred in maintaining the property.

Mr. Nash's testimony is substantiated by the other

AO 72A
(Rev. 8/82)

evidence in this case as to what issues the 2006 Consent Order intended to resolve. First, Mr. Nash's testimony that the 2006 Consent Order was intended to be a resolution of all title issues between all parties is supported by the transcript of the Mediation. Counsel for Wilmington Plantation at the Mediation stated that it was "a global settlement of *all issues* and all, you know, *anything that may be pending*, and that all motions will be withdrawn and we'll clean up all that --all of that also." Trial April 3-5, 2013, Ex. 39, p. 22 (emphasis added). The Superior Court stated the purpose of the settlement conference was to resolve all outstanding issues involving building repairs, "as well as the question of the cloud on the title involving the development of the associated sites on that property." Trial April 3-5, 2013, Ex. No. 39, p. 2-3.

Second, the Sheffer Quiet Title Action complaint and the Radinick Litigation were quiet title actions and clearly sought a determination that the condominium unit owners owned an undivided joint interest in the 19.846 acre "common area" due to Debtor's alleged submission of the entire tract to the condominium and failing to reserve any property for future development. This is the same issue Wilmington Plantation would like for this Court to resolve.

Further evidence of the intent of the parties as to title is set forth in the 2006 Consent Order itself:

> A) The Declaration of Condominium of Wilmington Plantation dated July 13, 2000, and recorded on December 5, 2002, in Book 243V, Page 688, et seq., Chatham County, Georgia records ("The Original Declaration") is reformed effective July 19, 2006, a true and correct copy which is marked "Petitioner's Exhibit 1" and made a part hereof.
>
> B) The security deed held by Wilmington Plantation, LLC's lender (recorded in Deed Book 292C, Page 634, Chatham County Real Property Records) <u>is intended to encumber only the property described in the First Amendment to the Declaration; that being nine building pads.</u>
>
> C) <u>Wilmington Plantation, LLC, acknowledges that it holds title to the nine building pads as described in the First Amendment</u>.
>
> D) UCC Financing Statements impose no lien on anything other than the property or equipment of Wilmington Plantation, LLC.

Dckt. No. 485, Ex. No. 33, Consent Order, ¶11 (emphasis added).

An amended Declaration was prepared by Wilmington Plantation's counsel and attached to the 2006 Consent Order which further evidences an intent of a global settlement among all the parties. In the amended Declaration attached to the 2006 Consent Order, Wilmington Plantation was named the declarant and agreed to title to nine building pads, and Wilmington Plantation was given seven years to add additional property. The 2006 Consent Order clearly states that Wilmington Plantation has title to nine building pads. Wilmington Plantation cannot now assert a claim against Foster

31

that it was entitled to the entire 19.846 acres.  The fact that Wilmington Plantation never signed or recorded an executed copy of the Amended Declaration does not change this analysis.

At the trial, Debtor testified that he intended and thought the 2006 Consent Order resolved all the title issues.  Debtor testified he would not have agreed to spend the $2.4 million dollars he has spent in reliance on the 2006 Consent Order if he thought outstanding title issues remained.

Lastly, Ken Kraft, a member of Wilmington Plantation, testified at the trial that Wilmington Plantation also believed the 2006 Consent Order resolved the title issues as to the nine building pads and that Wilmington Plantation would have fee simple title and be able to develop the property.  Tr. Trial April 3-5, 2013, Vol. I, p. 199, lines 12-25; p. 206, lines 2-6.  In his deposition, Mr. Hoffman, a member of Wilmington Plantation, stated that he believed the issues were resolved by the 2006 Consent Order and not by a trial.  Dep. of Hoffman, pp. 56-57.  Counsel for Wilmington Plantation in his deposition stated that is his recollection that the purpose of the settlement conference was to resolve all outstanding issues involving building repairs as well as the question of the cloud on the title.  Dckt. No. 507, p. 94-95.  He also spoke of the need for the Amended Declaration to clear up title to the nine

32

building pads which was at issue in the Mediation.  Id. at pp. 72, lines 15-18 and 96, lines 5-16.  Wilmington Plantation's actions also indicate that the 2006 Consent Order resolved all of its title issues.  Wilmington Plantation started to develop the land.  It was not until Wilmington Plantation tried to obtain financing and spoke to real estate attorneys did it attempt to re-assert a title problem may exist.  Wilmington Plantation in a letter to obtain financing indicated Wilmington Plantation had title to nine building pads.  This further supports Wilmington Plantation acknowledgment that the intent of the parties was to settle the title issues once and for all.

Based upon the evidence, I find Mr. Nash's testimony credible as to what claims were reserved for future litigation.  His testimony comports with the language of the 2006 Consent Order that states:  "[I]t is the intent of all parties that this Order constitutes a global settlement of all issues pending in each of the referenced cases" and the issue of title was clearly pending in the state court.  Furthermore, the reservation language itself recognizes that the matter before the Court is a "quiet title action."

Wilmington Plantation argues Mr. Nash's statements at the time of the Mediation, where he stated, "[i]t's fine not to have a release on [claim for homeowners' association dues] going in either

✎AO 72A
(Rev. 8/82)

direction, to except from the release. We would also except – with an e-x-c-e-p-t – from the release any claims between Mr. Foster and the new developer relating to expenditures having to do with the homeowners association or the development of properties that are not part of the quiet title action which is before the Court" indicate that the global settlement was just as to claims pending and its breach of contract and breach of warranty claims against Debtor were not pending. However, on this point the language of the 2006 Consent Order is not ambiguous. It states it is a global settlement of all pending issues. The parties at the Mediation spoke of the global settlement as a "release" and only carved out two exceptions. While Wilmington Plantation's specific claims were not pending, the issue of title to the property which is essential to Wilmington Plantation's claims as to this issue cannot be re-litigated.

Wilmington Plantation argues it did not execute a release of its claims and even if the Court finds the 2006 Consent Order resolved these issues, Wilmington Plantation still has breach of warranty and breach of contract claims from the date of the contract/deed delivery through the execution date of the 2006 Consent Order. I disagree.

> Settlement is, in and of itself, generally construed to be a final disposition of any claim against a party to settlement by a party to the settlement arising out of the subject

34

> incident, unless remaining claims are
> specifically reserved by any of the parties.
> Such compromises are upheld by general policy,
> as tending to prevent litigation, in all
> enlightened systems of jurisprudence.

Peacock v. Spivey, 629 S.E.2d 48, 51 (Ga. Ct. App. 2006) quoting

Carey v. Houston Oral Surgeons, LLC, 595 S.E.2d 633, 638 (Ga. Ct.

App. 2004). The parties at the Mediation talk in terms of the

settlement as a release, except for the exceptions previously

discussed. The 2006 Consent Order speaks in terms of a release

stating, "[e]ach of the parties waive, relinquish and *release* their

rights to pursue the recovery of attorneys' fees against the other.

The parties specifically excepted and excluded from the *releases* any

claims or potential claims between Mr. Foster and Wilmington

Plantation, LLC relating to expenditures pertaining to the homeowners

association or the development of the property that are not part of

the quiet title action which is before the Court." The 2006 Consent

Order was intended to be a global settlement of "all issues pending

in each of the referenced cases." The scope of the global settlement

was a resolution of these issues, and reserved no future avenues to

pursue these issues. For these reasons, I find Wilmington Plantation

settled all claims against Debtor pertaining to title to the property

and thus released Foster from such claims.

Wilmington Plantation argues even if there was a release

35

there was no consideration for the release and therefore the 2006 Consent Order is not binding upon it.   However, there was consideration for the release.   Wilmington Plantation was named the declarant and able to control the development of the property. Wilmington Plantation was able to continue to use the existing sales office.   All lis pendens and potential title issues were to be settled, in order to clear the way for Wilmington Plantation's continued development and sale of the condominium units.

Furthermore, "waiver need not be supported by consideration, is unilateral in character, must be made with knowledge and intent, and can be established by a certain course of conduct." Kothari, 733 S.E.2d at 822.  As previously discussed, this was styled as a "quiet title action" and the issue of title to the property was pending before the Superior Court during the Mediation. In the 2006 Consent Order, Wilmington Plantation acknowledges it has title to the nine building pads and all issues are settled other than the two previously discussed carveouts.   It is evident Wilmington Plantation participated in and was involved in the process.   At all times during the process, Wilmington Plantation was represented by counsel and agreed to these terms.   For these reasons, I find the 2006 Consent Order was entered with knowledge and intent, and the parties course of conduct reflect the settlement of all issues

36

involving the title.

Wilmington Plantation also argues there was no release of its claims against Foster as they were on the same side in the litigation. All parties consented to the global settlement of all title issues as to the property, carving out only two exceptions discussed by Mr. Nash. One of the exceptions was a claim between Debtor and Wilmington Plantation. This shows the parties were contemplating claims they had against each other. The global settlement did not carve out any other claims between these two parties. Therefore, the breach of contract and breach of warranty claims were not reserved for future litigation.

In the previous order, due to the ambiguity in the language of paragraph 12, a question of fact remained as to the intent of the parties. After determining the scope of paragraph 12, I now conclude the 2006 Consent Order was final as to the issues of title to the property among these parties. Wilmington Plantation's breach of contract and breach of warranty claims cannot now be re-litigated in the guise of a different claim. See Alyshah Immigration Agency, Inc., 2005 U.S. Dist. LEXIS 43624, at *6-7 (claims which are properly encompassed by the language of a consent order are barred); Anderson v. Jones, 745 S.E.2d at 795 (finding a consent order barred relitigation of an issue resolved by the settlement in the guise of

37

a different claim).

<u>Judicial Estoppel</u>.

In addition, the doctrine of judicial estoppel prevents Wilmington Plantation from asserting a position that is contrary to the one it asserted in state court as to the validity of the 2006 Consent Order and as previously discussed title to the property. Judicial estoppel is utilized to protect the integrity of the judicial process by preventing a party from deliberately changing positions according to the exigencies of the moment. <u>New Hampshire v. Maine</u>, 532 U.S. 742, 749 (2001); <u>Pew v. One Buckhead Loop Condo. Ass'n, Inc.</u>, 700 S.E.2d 831 (Ga. Ct. App. 2010). "This rule, known as judicial estoppel, 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" <u>New Hampshire v. Maine</u>, 532 U.S. at 749 <u>quoting</u> <u>Pegram v. Herdrich</u>, 530 U.S. 211, 227, n. 8 (2000). The Supreme Court stated three typical factors to consider:

> (1) a party's later position must be clearly inconsistent with its previous position;
>
> (2) whether the party succeeded in persuading a court to accept its prior position; and
>
> (3) whether the party would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

✎AO 72A
(Rev. 8/82)

Id. at 750-751. The Eleventh Circuit has considered two other factors in applying judicial estoppel: whether the inconsistent position was taken under oath in the prior proceeding and whether the inconsistent statements were calculated to make a mockery of the judicial system. Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1285 (11th Cir. 2002). The factors are not inflexible prerequisites or an exhaustive formula and all of the circumstances of each case must be considered in making the determination. Id. at 1286; Palmer v. Cay, Inc. v. Marsh & McLennan Co., Inc., 404 F.3d 1297, 1307 n. 16 (11th Cir. 2005).

Debtor argues the doctrine of judicial estoppel prevents Wilmington Plantation from questioning the validity of the 2006 Consent Order. Now that I have determined that the scope of paragraph 12 of the 2006 Consent Order includes title matters, the application of judicial estoppel doctrine needs to be re-examined. In connection with the state court action, Wilmington Plantation argued successfully that service on the owners was proper and urged the state court to uphold the validity of the 2006 Consent Order as it was facially valid. First, the Court must determine whether Wilmington Plantation's position is clearly inconsistent with the position taken in state court.

Wilmington Plantation in its response to the motion to set

39

aside, stated that service was made on all unit owners and mortgage holders and Wilmington Plantation's counsel represented to the state court judge that service had been made on all interested parties and that the court gave everyone an opportunity to object or be bound by the 2006 Consent Order.   Dckt. No. 460, Ex. V, pp. 5 and 10. Furthermore, Wilmington Plantation's response quotes the language of the 2006 Consent Order itself which states that service had been made on all interested parties and that no objection had been made after opportunity had been given.   In the state court actions, Debtor's Motion to Set Aside challenged:  whether Georgia Condominium Act was violated, whether summons being served was necessary to effectuate a quiet title action, whether enforcement of the 2006 Consent Order would require a trespass; and whether the property rights of unit owners were modified without their consent.  Debtor argued that the 2006 Consent Order was invalid on its face.  Wilmington Plantation opposed Debtor's motion arguing:  the 2006 Consent Order was not void on its face due to any jurisdictional issues; that Debtor lacked standing to assert the rights of third party unit owners; and that Wilmington Plantation and other innocent third parties had relied upon and expended considerable sums of money and effort in that reliance.  These arguments are inconsistent with position now taken by Wilmington Plantation in this contested matter.  In this current

40

action, Wilmington Plantation is questioning the validity of the 2006 Consent Order stating jurisdiction was not proper over the unit owners, it is pursuing in this Court the very same argument it successfully opposed in the state court proceedings.  Given these facts, I find the first consideration of judicial estoppel is met.

As to the second factor, as discussed above, Wilmington Plantation succeeded in persuading the state court to rely on its position.  The order denying Debtor's Motion to Set Aside notes the parties strenuously opposed each other and states that the Judge read and considered the briefs of the opposing parties and it found Debtor's arguments that "the court lacked jurisdiction, that the order is invalid on its face, and the order is unenforceable according to its own terms" to be without merit and it denied the motion to set aside.  Dckt. No. 460, Ex. AA.

While the brief is not technically under oath, an attorney's signature on the brief means and represents a certain amount of good faith and in fact is a certification that the pleading has been read by learned counsel and is not filed to delay an action. O.C.G.A. §9-11-11; see Luzinski v. Peabody & Arnold LLP (In re Gosman), 382 B.R. 826, 842 (S.D. Fla. 2007)(stating that pleadings are equivalent to sworn statements for the purposes of judicial estoppel).  The Eleventh Circuit has noted the factors for judicial

41

◈AO 72A
(Rev. 8/82)

estoppel are not rigid and given the facts of this matter, I find the briefs of counsel sufficient to comply with this element to the extent necessary. See Burnes, 291 F.3d at 1286 ("[W]e recognize that these two enumerated factors are not inflexible or exhaustive; rather, courts must always give due consideration to all of the circumstances of a particular case when considering the applicability of this doctrine."). The state court read and considered the briefs of Wilmington Plantation and others and ruled in Wilmington Plantation's favor. Now, upon reflection, Wilmington Plantation wants to switch sides and argue the same arguments it successfully defeated. I therefore find the second element of judicial estoppel is met.

Next, I find Wilmington Plantation would derive an unfair advantage or impose an unfair detriment on Debtor and other third parties if not estopped. Wilmington Plantation successfully argued it, as well as the unit owners, had relied to their detriment on the validity of the 2006 Consent Order. Debtor also has expended substantial sums and effort in reliance on the validity of the 2006 Consent Order. Debtor testified he has spent over $2,407,000.00 in satisfaction of all his obligations under the 2006 Consent Order. In reliance on the validity of the terms of the 2006 Consent Order, Debtor also allowed the statute of limitations of any potential

42

malpractice claim(s) to expire.  If this Court were to entertain and agree with Wilmington Plantation's argument that the 2006 Consent Order is invalid this would impose an unfair detriment to Debtor and other third parties.

Furthermore, allowing Wilmington Plantation to take a directly contrary position on the issue of the validity of the 2006 Consent Order after the state court has adopted its position would provide Wilmington Plantation with an unfair advantage and make a mockery of the judicial system.  For these reasons, I find Wilmington Plantation is estopped from asserting its arguments pertaining to the validity of 2006 Consent Order.  Furthermore, while Wilmington Plantation argues the 2006 Consent Order did not bind all unit owners, it certainly binds Debtor and Wilmington Plantation, express parties to the 2006 Consent Order.

Wilmington Plantation argues Debtor's renewed motion for summary judgment is untimely.  However, the Court's previous summary judgment order stated that questions of fact remained on Debtor's defenses and at the conclusion of the evidence, Debtor timely moved for a Judgment on Partial Findings pursuant to Federal Rule of Civil Procedure 52(c) made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 7052.  Debtor's Rule 52(c) motion was made on the same grounds as those presented in Debtor's summary

43

judgment motion.  Because the Court is granting Debtor's Rule 52(c)

motion it is not necessary to further elaborate on Debtor's motion

for summary judgment.

> Judgment entered under this rule differs from
> a summary judgment under Rule 56 in the nature
> of the evaluation made by the court.  A
> judgment on partial findings is made after the
> court has heard all the evidence bearing on the
> crucial issue of fact, and the finding is
> reversible only if the appellate court finds it
> to be "clearly erroneous." A summary judgment,
> in contrast, is made on the basis of facts
> established on account of the absence of
> contrary evidence or presumptions; such
> establishments of fact are rulings on questions
> of law as provided in Rule 56(a) and are not
> shielded by the "clear error" standard of
> review.

Fed. R. Civ. P. 52, advisory committee note to 1991 Amendment. "A

court may grant a Rule 52(c) motion made by either party or may grant

judgment sua sponte at any time during a bench trial, so long as the

party against whom judgment is to be rendered has been fully heard

with respect to an issue essential to that party's case." EBC, Inc.

v. Clark Bldg. Sys., Inc., 618 F.3d 253, 272 (3d Cir. 2010).

Debtor's motion is timely as it was made at the trial after the close

of Wilmington Plantation's evidence and then the motion was renewed

at the close of the trial after Wilmington Plantation had been fully

heard on all necessary issues.  See e.g. Horowitch v. Diamond

Aircraft Industr., Inc., 2009 WL 5171769 *1 (M.D. Fla. Dec. 22,

2009)(motion made at trial after close of the plaintiff's case).

After hearing the pertinent evidence as to the crucial issue of fact

to determine the scope of the intent of the parties as to the 2006

Consent Order, I find Debtor is entitled to judgment as a matter of

law on the defense of res judicata and judicial estoppel. The other grounds such as laches, waiver and mitigation of damages were addressed in the previous order on summary judgment. Furthermore, for the reasons addressed in the previous order on summary judgment, I find Debtor is not entitled to judgment as to the issues of waiver/caveat emptor, laches, and mitigation of damages.

For the foregoing reasons, Debtor's motion pursuant to Federal Rule of Civil Procedure 7052 is ORDERED GRANTED and his Objection to the Claim of Wilmington Plantation is SUSTAINED.

_____
SUSAN D. BARRETT
CHIEF UNITED STATES BANKRUPTCY JUDGE

Dated at Augusta, Georgia
this ___24th___ day of September 2013.

AO 72A
(Rev. 8/82)